UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                     :

WELLS FARGO BANK, N.A., as Trustee for the  :
Registered Holders of Banc of America        :
Commercial Mortgage Pass-Through Certificates,  :
Series 2007-5, acting by and through its Special  :
Servicer C-III ASSET MANAGEMENT, INC.,    :         10 Civ. 9584 (JPO)
                                Plaintiff,  :
                                       :        MEMORANDUM AND
             -against-                :          ORDER
                                       :
BANK OF AMERICA, N.A.,              :
                             Defendant  :
                                       :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Wells Fargo, N.A. ("Wells Fargo" or "Plaintiff"), as Trustee for the Registered Holders of

Banc of America Commercial Mortgage Pass-Through Certificates, Series 2007-5 ("the Trust"),

acting by and through its Special Servicer C-III Asset Management, Inc., brought this action

against Bank of America, N.A. ("BOA" or "Defendant") for breach of contract.  Before the Court

are Wells Fargo's motion for summary judgment, BOA's cross-motion for summary judgment,

and BOA's motion to preclude the Declaration of Michael Grant.  For the reasons that follow,

Wells Fargo's motion for summary judgment is granted, BOA's cross-motion is denied, and

BOA's motion to preclude the Grant Declaration is denied as moot.

**I.**      **Background**

      **A.**      **Factual Background**

            **1.**      **The Surrey Loan**

      This case concerns a loan in the amount of $39,977,571 ("the Loan") made by BOA to

Surrey Group, LLC ("Surrey"), evidenced by an "A-Note" in the amount of $37,179,141 and a

"B-Note" in the amount of $2,798,430.[1]  The Loan was for the purchase of twenty-three multifamily buildings located in Hartford, Connecticut ("the Property").  The Loan was subject to the Amended Restated Loan Agreement, dated February 5, 2007 ("the Agreement"), between Surrey, as borrower, and BOA as lender.  BOA sold the A-Note to the Trust, pursuant to a Mortgage Loan Purchase and Sale Agreement, dated December 1, 2007 ("the MLPSA").  The MLPSA contained certain representations and warranties, the alleged breaches of which are the subject of the instant case.

On January 1, 2009, Surrey defaulted on the Loan.  On or about August 24, 2009, and February 8, 2010, Plaintiff gave written notices to BOA of alleged Material Breaches of the various Warranty Representations ("Reps") in the MLPSA.  Pursuant to Section 2.03 of the Pooling Services Agreement ("PSA"), Plaintiff requested that BOA either cure the breaches or repurchase the A-Note portion of the Surrey Loan.  To date, BOA has denied that it breached any Rep and contends that it has no obligation to cure or repurchase the A-Note.

### 2.  The Trust

On or about December 1, 2007, BOA sold the Loan, along with many other commercial loans, to Banc of America Commercial Mortgage, Inc. ("BACM") pursuant to the MLPSA. Pursuant to the PSA, BACM sold and transferred to the Trust 100 commercial real estate mortgage loans, which also included the Loan.  The PSA, dated December 1, 2007, governed the Loan.  As a general rule, a trust such as the one at issue here issues bonds or certificates "represent[ing] the beneficial ownership interests in the trust."   (Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment, Dkt. No. 74 ("Pl.'s Mem."), at 3.) "Throughout the existence of the trust, the loans are serviced in accordance with the pooling and

---

[1] A-Notes are so called because they are less risky than B-Notes.  Losses on a mortgage are allocated first to B-Note holders and then to A-Note holders.

servicing agreement or PSA." (*Id.*)  Wells Fargo is the trustee for the Certificateholders and is acting by and through C-III Asset Management LLC ("C-III"), the special servicer responsible for servicing and administering those loans in the Trust that are in default.  "C-III was appointed as special servicer in the 2007-5 Securitization by its affiliated investment fund."  (Defendant's Memorandum of Law in Opposition, Dkt. No. 81 ("Def.'s Opp."), at 1.)

### 3.     The Assignments Preceding the Loan

The aforementioned Loan giving rise to the instant suit possesses a complex history.  The facts regarding the assignments preceding the Loan are undisputed.  The extent to which BOA knew of the nature of the dealings in the months before it agreed to finance the Property, however, is hotly contested, and largely forms the subject of the pending cross-motions for summary judgment.

In December 2004, Coolidge Benton LLC, Coolidge Forrest LLC and Coolidge Woodland LLC (together, "Coolidge") purchased the Property for $32,626,249.  (Plaintiff's Statement of Material Facts, Dkt. No. 75 ("Pl.'s SMF"), at ¶ 18.)  In 2006, Coolidge offered the Property for sale for a price of $36,775,000.  (*Id.* at ¶ 20.)  In September 2006, one Martin Carlin ("Carlin") agreed to purchase the Property from Coolidge for $35,000,000.   This purchase was governed by an Agreement of Purchase and Sale (the "Purchase Contract").  BOA contends that there are two versions of the Purchase Contract, noting that it received only a redacted version of that agreement, and thus, was unaware that Carlin was a party to this first sale.  (Defendant's Statement of Material Facts, Dkt. No. 83 ("Def.'s SMF"), at ¶ 21, n. 2.)

Soon after entering into the Purchase Contract, Carlin ostensibly assigned the agreement to himself, by assigning it to an entity called EZ Building, LLC ("EZ"), which he created and claims to have owned.  However, BOA underscores the fact that "[a]part from Carlin's

testimony, there is no evidence that he was a member of EZ; instead, Nelly Mendez formed EZ and was the sole signatory on all EZ documents publicly available or in Bank of America's possession." (*Id.* at ¶ 24 (citing Def.'s Ex. H[2] Assignment at WHC00000244 and 273; *see also* Def.'s Ex. I; Def.'s Ex. M).)  In actuality, Nelly Mendez was Carlin's girlfriend and secretary, and, according to Plaintiffs and Carlin, she served as Carlin's strawperson.  As BOA notes, "[t]he organizational documents of EZ indicated that Nelly Mendez was the only member of EZ." (*Id.* at ¶ 25; Def.'s Ex. M.)  Additionally, "Nelly Mendez was the only signatory on the Operating Account's Business Depository Resolution, which required the signature of *all* members of EZ." (Def.'s SMF at ¶ 25; Def.'s Ex. AAAAA.)

In October 2006, EZ assigned the right to purchase the Property to Surrey.  Surrey's ownership structure was as follows: Robert Sandell—Carlin's son-in-law—owned 24 percent; Shawn Carlin—Carlin's son—owned 24 percent; Surrey Specialty Corp. owned 0.5 percent; and Carlin owned 51.5 percent.  The parties disagree as to whether there was consideration for the assignment contract between EZ and Surrey.  According to BOA, the Carlins executed a $9,000,000 promissory note (the "Carlin Note"), which constituted an obligation to pay EZ by the Carlins, and provided other valuable consideration for the assignment.  (Def.'s SMF at ¶ 31.) Wells Fargo notes that "[t]he purported consideration . . . was not interest bearing, was unsecured, called for the full payment of the principal balance in one lump-sum payment in one year, did not include any down-payments and included a calculation which provided credit for the early payment of the note . . . ." (Pl.'s SMF at ¶ 32.)  However, BOA underscores the characterization of the Carlin Note as valid consideration, emphasizing that the Note "provided

---

[2] The exhibits attached to Defendant's opposition and cross-motion for summary judgment are all attached to the Declaration of Jason M. Halper, Dkt. Nos. 88 and 97, and are cited as "Def.'s Ex. _" throughout this opinion with corresponding letters.

that it was not secured by the Property or by the Carlins' membership interests in the Borrower," meaning that the Note was a "personal obligation of the Carlins, repayment of which was to be funded by the Carlins' personal assets rather than the income generated by the Property." (Def.'s Opp. at 6; Def.'s Exs. AA, II; Pl.'s Ex. 20).[3]

In December 2006, Surrey applied for $40,000,000 in financing with BOA to assist in the acquisition of the Property. Surrey, through the assignment contract between itself and EZ, represented to BOA that the purchase price of the Property was $45,000,000, evidencing this in an Agreement of Assignment and Assumption of Contract of Sale ("the Assignment Contract"), dated October 16, 2006. (Def.'s Opp. at 5.) The Assignment Contract was executed by Nelly Mendez, on behalf of EZ, and Carlin on behalf of Surrey, and referenced the Purchase Contract, between Coolidge as seller and EZ as assignee-purchaser. (*Id.*) Thus, according to BOA, there was no understanding that the assignments preceding the loan request were not at arms' length, as BOA had not received documents indicating that Carlin was on all sides of said transactions. In sum, according to BOA, Surrey's attorney "informed [BOA's] originator that the purchase price of the Property under the Agreement of Purchase and Sale between a prior owner and EZ was $35 million, and that EZ was assigning its rights under the Agreement of Purchase and Sale to the Borrower for an additional $10 million." (*Id.* at 6.)

The final Settlement Statement prepared by First American Title Company undisputedly states that the purchase price or consideration paid to Coolidge was $35,000,000. (Pl.'s Ex. 28.) Wells Fargo contends that this amount reflects the fact that Carlin artificially inflated the price of the Property through numerous assignments, and that BOA overfunded the Loan by providing

---

[3] The exhibits attached to Plaintiff's motion for summary judgment and reply memorandum all are attached to the Declaration of Colleen M. Mallon, Dkt. Nos. 76 and 95, and are cited as "Pl.'s Ex. _" throughout the this opinion with corresponding numbers.

nearly $40,000,000.00 in financing.  (*See* Pl.'s Mem. at 6; Pl.'s SMF at ¶¶ 43, 44, 47, 52, 53.)

However, BOA contests this characterization, arguing instead that the Settlement Statement

"identifies the consideration as $35 million because under Connecticut state law, the real estate

conveyance tax was paid only on the $35 million amount and not on the $10 million

assignment."  (Def.'s SMF at ¶ 48.)  According to BOA, "[t]he evidence . . . demonstrates that,

[BOA] issued $39,977,571 in loan proceeds to assist [Surrey] in acquiring the Property (the fair

market value of which was $48.2 million) at a purchase price of $45 million."  (Defendant's

Reply Memorandum of Law, Dkt. No. 96 ("Def.'s Rep.") at 22.)

### B.    Procedural Background

Wells Fargo commenced this action against BOA on September 13, 2010.  (Dkt. No. 1

("Compl.").)  The Complaint was amended on January 6, 2012.  (Dkt. No. 58 ("Am. Compl.").)

BOA answered on January 30, 2012.  (Dkt. No. 65 ("Ans.").)  On June 26, 2012, Wells Fargo

moved for summary judgment.  (Dkt. No. 73.)  On July 27, 2012, BOA opposed Wells Fargo's

motion and cross-moved for summary judgment.  (Dkt. No. 80.)  BOA also moved to preclude

the Declaration of Michael Grant.  (Defendant's Memorandum of Law in Support of its Motion

to Preclude, Dkt. No. 78 ("Def.'s Mem. Prec.").)  On August 13, 2012, Wells Fargo opposed

BOA's motion to preclude.  (Dkt. No. 90 ("Pl.'s Opp. Prec.").)  BOA replied to Wells Fargo's

opposition to the motion to preclude on August 23, 2013.  (Dkt. No. 92 ("Def.'s Rep. Prec.").)

On September 4, 2012, Wells Fargo replied to BOA's opposition to Wells Fargo's motion for

summary judgment, and opposed BOA's cross-motion.  (Plaintiff's Reply, Dkt. No. 93 ("Pl.'s

Rep.").)  On October 5, 2012, BOA replied to Wells Fargo's opposition to BOA's cross-motion

for summary judgment.  (Def.'s Rep.)

**II.     Discussion**

**A.     Summary Judgment Standard**

"Pursuant to Federal Rule of Civil Procedure 56, summary judgment 'is appropriate when the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Borghese Trademarks, Inc. v. Borghese*, No. 10 Civ. 5552, 2013 WL 143807, at *6 (S.D.N.Y. Jan. 14, 2013) (citation omitted).  The non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Ricci v. Stefano*, 557 U.S. 557, 586 (2009) (citation omitted).  An issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists," illustrating his entitlement to relief. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  A movant does so by coming "forward with evidence on each material element of his claim or defense . . . ." *Figueroa v. Escourse*, No. 09 Civ. 8110, 2011 WL 2419866, at *1 (S.D.N.Y. June 6, 2011). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

"On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).   A motion for summary judgment prevails "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party." *White v. ABCO Engineering Corp.*, 221 F.3d 293 (2d Cir. 2000) (quoting *Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) (quotations omitted)); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere

7

"conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

**B.     Breach of Contract**

Wells Fargo moves for summary judgment on four contractual breaches of the Reps, alleging multiple breaches of express warranties contained in the MLPSA.[4]  In response, BOA moves for summary judgment on three of the alleged claims, contending that Wells Fargo cannot prove a breach of those particular Reps.

**1.     Breach of Warranty**

Wells Fargo asserts contract claims against BOA based on BOA's alleged breach of express warranties contained in the Reps of MLPSA.  "Under New York common law, upon showing that: (1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant, plaintiff is entitled to be indemnified for any damages incurred as a result of such breach."  *Promuto v. Waste Management*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999); *accord  Lasalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 626 (D. Md. 2002) ("A buyer may hold a seller accountable for breach of an express warranty upon a showing: (1) that the plaintiff and defendant entered into a contract; (2) that the contract contained an express warranty by the

---

[4] Wells Fargo seeks summary judgment on Reps 15, 31, 39, and 49.  Alleging that there was no breach of the warranties in Reps 15, 30, and 49, BOA seeks summary judgment on those Reps. Alternatively, BOA also seeks summary judgment on all of Wells Fargo's claims on a theory that none of the purported breaches had a material adverse effect on the certificateholders.  This theory is discussed *infra* in Section II.B.4.

defendant with respect to a material fact; (3) that the warranty was part of the basis of the bargain; and (4) that the defendant breached the express warranty.").

Here, there is no dispute that (1) the parties entered into a contract—namely the MLPSA and the PSA; (2) the MLPSA contained certain express warranties in the form of the Reps; or (3) the warranty constituted the "basis of the bargain."  Accordingly, the only issue before the Court is whether BOA materially breached any of the express warranties in the MLPSA.[5]

### 2.      Contract Interpretation Principles Under New York Law

"Because the parties disagree as to the meaning of a number of the disputed warranties, the Court must seek 'to effectuate the intention of the parties as evidenced by the language they used, and [is] therefore bound to enforce the terms of the agreement as set down in an integrated, written instrument.'"  *Lasalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 04 Civ 5452, 2007 WL 2324052, at *8 (S.D.N.Y. Aug. 13, 2007) (quoting *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001)).  "When interpreting unambiguous contract terms, '[e]vidence outside the four corners of the document . . . is generally inadmissible to add to or vary the writing.'"  *Wells Fargo Bank, N.A. v. Bank of America*, No. 11 Civ. 4062, 2013 WL 372149, at *4 (S.D.N.Y. Jan. 31, 2013) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (Ct. App. 1990)).  However, whenever contractual terms are ambiguous, meaning they are "reasonably subject to differing interpretations," courts are free to "turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties."  *Scholastic*, 259 F.3d at 82.  Though the meaning of an

---

[5] The PSA defines the term "breach" as "[w]ith respect to any Mortgage Loan, any breach of representation or warranty made by the Mortgage Loan Seller pursuant to Section 4(b) of the Mortgage Loan Purchase and Sale Agreement."  (Def.'s Ex. C at BANA_HART_282407.)

ambiguous contract that turns on factual issues is a determination reserved for the factfinder,

*whether* a contract is ambiguous is a question of law for the Court.  *Id.*

### 3.      Analysis of Rep 39

Wells Fargo seeks summary judgment on its claim that BOA breached Rep 39, which

provides:

> (39)  <u>Origination, Servicing and Collection Practices</u>.  The
> origination (or acquisition, as the case may be), collection, and the
> servicing practices used by the Seller and its affiliates or
> contractors engaged by it with respect to the Mortgage Loan have
> been in all respects legal and have met customary standards
> utilized by prudent commercial or multifamily, as applicable,
> lenders and servicers.

(Pl.'s SMF at ¶ 158; Pl.'s Ex. 3 at Schedule II, 000041.)  With respect to Rep 39, Wells Fargo

alleges, *inter alia*, that BOA failed to comply with its own origination procedures, by originating

a loan where the borrower did not provide 15% cash equity and where the LTC ratio was greater

than 86%, thus evincing a failure to meet "customary standards" within the industry.  (Pl.'s

Mem. at 26-27.)  BOA counters by contending: (1) that the term "origination" is ambiguous as to

whether it includes the practices to which Wells Fargo refers in asserting its claims; (2) that

BOA's internal guidelines are neither binding, nor reasonable indicators of customary standards

within the industry; (3) that the term "cash equity" is not mentioned in the applicable internal

guideline; and (4) that, in any event, "cash equity" is a term of art subject to multiple

interpretations within the industry, rendering the Loan's conformance a disputed issue of

material fact.  (*See* Def.'s Opp. at 48-49, 52-55.)

Though the Court agrees with BOA that the record reflects competing evidence as to whether "origination" constitutes the underwriting and closing aspects of the loan process,[6] the term nevertheless unambiguously refers to the steps by which a loan is, in fact, originated.  By way of background, so-called origination refers by its terms to "the first and necessary step which not only finances (or refinances) the purchase or improvement of a home or other asset but also creates a stream of cash flows which generates the returns to investors in mortgage or asset-backed securities."  Ronald Greenspan & William Nolan, Mortgage and Asset Backed Securities Litigation Handbook § 1:11.  As a general rule, "[t]he origination process includes a due diligence analysis of the collateral property, the character, credit and financial capacity of the proposed borrower and current and potential future market conditions that will affect the potential value of the collateral."  *Id.*  "[T]he originator will negotiate with its prospective borrower the appropriate principal amount, interest rate, terms and conditions of the loan," and in turn, these conditions are, at bottom, designed to "mitigate, to the extent possible, general and specific risk factors associated with the proposed loan, minimize the likelihood and severity of

---

[6] Wells Fargo's origination expert stated in his deposition that "origination refers to the process of making a loan, which includes underwriting and closing."  (Pl.'s SMF at ¶ 180; Pl.'s Ex. 1 at 136-137, 139-140, 141-142.)  Wells Fargo also notes that "in every instance in which the MLPA uses the term 'origination' it refers to the date on which the loan closed or the process of originating the loan, which necessarily includes underwriting and closing."  (Pl.'s Mem. at 23; (Pl.'s Ex. 2, at Schedule II, Reps 2, 12, 16, 23, 25, 26, 28, 30, 31, 32, 33, 36, 39, 46, 48, 49, 51.)  However, BOA counters with the report of its own expert, Timothy Dwyer, which notes: "Since underwriting and closing are separate aspects of the loan process from origination, servicing and collection, many of the other R&Ws in the MLPA (other than R&W 39) specifically address underwriting and closing issues.  *If*, as Plaintiff asserts, R&W (39) purports to cover all facets of underwriting and closing, it would be unnecessary to address underwriting and closing issues in other R&Ws as well."  (Declaration of Timothy W. Dwyer in Support of Defendant's Cross-Motion, Dkt. No. 85 ("Dwyer Decl."), Ex. A, at 34 (emphasis in original).)  Moreover, BOA points out that even its own internal guidelines separate origination, underwriting, and closing as separate stages of the loan process.  (Def.'s Opp. at 49; Def.'s Ex. OOOO at BANA_HART_284907, BANA_HART_284911.)

possible monetary loss, and maximize the probability that the loan can be sold to the ABS[7]

trust as anticipated." *Id.*

BOA's internal guidelines undisputedly state that, with respect to capitalization:[8]

> In all Mortgage Loans, the Lender will determine the Borrower's
> capital basis in the project.  In the event of acquisition Loans or the
> refinance of an existing Loan within the first (12) months of
> ownership, Loan proceeds will be restricted in accordance with the
> following: . . .
>> 2. **At Acquisition.**  Loan Amount shall be limited to a
>> maximum eighty-five percent (85%) of the contract
>> price including closing costs limited to a maximum
>> fifteen (15%) percent of the contract price.

(Pl.'s Ex. 24, at BANA_HART_284827, 105(A)(2).)  Wells Fargo asserts that, since the

guidelines state that the Loan Amount shall not exceed 85% of the contract, any given borrower

must provide at least 15 percent cash equity.  BOA disagrees, noting that (1) "cash equity" is not

mentioned in Section 105(A)(2) of the guidelines; and, alternatively (2) "cash equity" constitutes

a term of art that does not necessarily refer to "cash."  BOA's first argument is disposed of

easily.  The unavoidable consequence of a loan amount that is limited to 85% of the contract

price is that the remaining 15% must be made up by cash equity provided by the Borrower.  This

conclusion is underscored by the policy behind limiting a loan amount to less than 100% of the

purchase price; put another way, the incentives of a borrower who fails to contribute any cash

equity—whatever the definition of cash equity, whether literally *cash* or a term of art—to a

purchase price or contract price are perverted, as it has no "skin in the game."  (Pl.'s Ex. 2 at

---

[7] ABS refers to "Asset-Backed Securities."

[8] Capitalization refers to the capital basis in a given loan proposal.  "The cash equity is usually
defined in the approval package for a loan and is then verified at the loan closing when the
money is disbursed."  (Pl.'s Ex. 2 at 23.)  Thus, the capitalization of a particular proposal is an
aspect of origination in the sense that the lender will not originate a particular loan, and thus
proceed to underwriting and later, closing, until a capital structure is determined and approved.

24);[9] *see also Verex Assur., Inc. v. John Hanson Sav. and Loan, Inc.*, 816 F.2d 1296, 1302 (9th

Cir. 1987) ("In evaluating the risk of insuring a loan, the mortgage guaranty insurer considers (1)

the borrower's credit and cash equity to determine likelihood of repayment[.]").

     BOA's second argument—that "cash equity" does not constitute cash—requires further

elucidation.  It is undisputed that Surrey did not provide the remaining 15% on the contract price

in the form of a cash payment.  Instead, this remaining amount was made up by the Carlin Note,

which was a personal obligation of the Carlins to pay EZ.  (*See* Def.'s Opp. at 6 ("Pursuant to the

terms of the Assignment, the Carlins agreed to pay $9 million to EZ via an unsecured promissory

note executed in their personal capacities (the 'Carlin Note.'")).)  The terms of the Carlin Note

provided that the assignor, EZ, could not, under any circumstances, "seek reimbursement from

the membership interests or the property contemplated in the [Assignment]."  (Def.'s Ex. II at

BANA _ HART 000840.)  Later, at closing, Carlin contributed $700,000 in cash as a deposit;

another $2,500,000, which was included in the loan amount, went to pay down the Carlin Note;

and the Carlin Note remained as a $6,356,080.67 obligation of the Carlins to assignor EZ.

(Def.'s Ex. AA at BANA_HART_210152.)  This financing structure is confirmed by the Closing

Statement (*id.*), together with an email from Andrew Baltz, BOA's senior closer, in which he

confirmed that the approximate capitalization of the Loan was as follows: Total Costs of

---

[9] Plaintiff's expert makes the point that commercial mortgage-backed securities ("CMBS") loans "are non-recourse[,] which  means that the loan is collateralized by the property and the borrower is rarely personally liable except for fraud, misrepresentation, or waste." (*Id.*)  That is, without some form of equity invested in the property, due to the non-recourse nature of CMBS loans, the borrower will not have an asset behind the loan. (*Id.*)  To the extent that BOA contends that Wells Fargo's expert's reports are inadmissible as unsworn (*see, e.g.*, Def.'s SMF at ¶ 1), the Court rejects BOA's contention, as "Plaintiff submitted the deposition testimony of its experts where they testified under oath that their opinions are reflected in their reports" (Pl.'s Rep. at 38 n. 42), and Wells Fargo also provided supporting declarations of its experts as exhibits to its reply.  (*Id.*; *see also* Pl.'s Exs. 121 and 122.)

$47,050,000; BOA Loan of $40,000,000; Personal Note of $6,350,000; and Cash of $700,000.[10]
(*Id.* at BANA_HART_210146.)

Wells Fargo would have it that "cash equity" means what it says: cash. Accordingly, since Surrey, the borrower, contributed only a nominal 1.5% of the purchase price as a deposit on the Property ($700,000), Wells Fargo asserts that BOA failed to adhere to its internal guidelines which reflect a requirement that a borrower have at least 15% cash equity as an asset in the subject of a given loan. (Pl.'s Ex. 24, at BANA_HART_284827, 105(A)(2).) BOA counters that "cash equity" is a term of art in the CMBS industry that refers to the "difference between the purchase price of an asset and the loan amount." (Def.'s Opp. at 34.) BOA's expert has opined that promissory notes may qualify as "cash equity" of a borrower if the note constitutes a "personal obligation of the borrower's principals." (*Id.*; *see also* Dwyer Decl., Ex. A, at 39 ("[T]he composition of cash equity does not, according to industry standards, need to consist of currency. A promissory note, provided by the principals of a borrower in their personal capacity, can according to customary industry standards, also qualify as such.").) According to BOA, so long as a borrower remains personally liable with respect to a promissory note, such debt is a permissible "cash equity" contribution to the capitalization of a loan.

BOA's argument is belied by common sense, the record, and the testimony of its own employees. First, as a matter of logic, a putative borrower who contributes to the purchase price of an asset with an unsecured promissory note contributes a promise to pay, rather than cash equity. And while the existence of a promissory note executed on behalf of a borrower undoubtedly reflects that cash has been provided by someone—namely, the payee—in such a

---

[10] The Baltz email actually states "$700M" as the cash contribution, but this appears to be a clerical error, as the Closing Statement notes that the down payment constituted $700,000, and all parties agree as to this number.

circumstance, the borrower necessarily has not generated that cash, and accordingly, such a note does not reflect a *borrower's* cash contribution to an asset price.  (Pl.'s Ex. 2 at 23 ("Cash equity is the amount of cash that the purchaser pays for a property that is not borrowed.").)  Second, to the extent that BOA and its expert contend that "cash equity" is a term of art, this assertion is rendered unreasonable by exchanges among BOA's own employees that include the term.  For example, in a January email, Baltz noted that the financing or capitalization of the purchase price was to be as follows: "$36,000,000 in cash and assignor [EZ] is taking a $9MM unsecured note from the principals of our borrower."  (Pl.'s Ex. 31 at BANA_HART_ 247993-247994.)[11]  Later, in October 2007, David Fallick, Managing Director in BOA's CMBS group noted: "The problem was the prescreen / credit approval (it should not have happened) . . . I will say it again, the NO cash equity was the icing on the cake of an already very tough deal."  (Pl.'s Ex. 32 at BANA_HART_288238.)  In explaining the Fallick email, BOA claims that the comments were an "expression of frustration" and in no way "suggest . . . that there was no equity in the deal." (Def.'s Opp. at 44 n. 29.)  This argument is unavailing.  Though Fallick's email may well have constituted an expression of frustration, he unequivocally stated that there was no "cash equity" in the deal.

Additionally, the BOA credit approval package ("CAP") confirms that no one at BOA reasonably construed the promissory note as "cash equity."  For example, the CAP stated as follows: "The result is a purchase price of $45,550,000 to be funded by the $38,214,571 in net loan proceeds . . . , *$4.2MM in personal note and $3,113,000 in cash equity*."  (Pl.'s Ex. 36 at BANA_HART_207182 (emphasis added).)  This language, though it does not reflect the final

---

[11] Baltz also reiterated in his deposition that Surrey did not contribute any cash to the capitalization.  (*See* Pl.'s Ex. 12 at 73:7-13 ("Q: You know for a fact, as you sit here today, the borrowers had cash in the deal? A: As I sit here today means everything I know today? Q: Yes. A: I think everything that – that as – as of today, they didn't.")

terms of the Loan's capitalization at closing, is highly suggestive of the conclusion that BOA did not, in fact, view a promissory note as equivalent to cash equity, given that it separated the two in its CAP language.  Moreover, other courts have come to similar conclusions with respect to the meaning of cash equity.  *See Firstier Morg. Co. v. Investors Mortg. Ins. Co.*, 708 F. Supp. 1224, 1229 (W.D. Okla. 1989) (holding that where borrowers had not contributed down payments or "earnest deposits" they therefore had no cash equity in the subject properties); *accord Verex*, 816 F.3d at 1302 ("The difference between loan and sales price reflected the amount of cash equity each borrower would provide and the down payment Verex assumed would be paid.").  In sum, "cash equity" means what the term denotes—a cash contribution to the subject asset backed by a given loan—and the origination of the Loan undisputedly did not reflect such a financing arrangement.  And, in so doing, the origination of the Loan departed from BOA's internal guidelines, which, as discussed *supra*, underscores the importance of a cash equity contribution on the part of a putative borrower.  The contention of BOA's expert that "cash equity" is a term of art in the industry is insufficient to create a genuine issue of material fact as to the meaning of the term in light of the record and case law.

BOA next argues that even if (1) "cash equity" refers to cash, rather than a promissory note, *and* (2) BOA departed from its own guidelines in originating a loan where the borrower did not provide such cash equity, there was nevertheless no breach of Rep 39, as its guidelines are neither mandatory, nor representative of customary standards within the multifamily lending industry.  The Court agrees that BOA's internal guidelines are neither law, nor integrated contractual terms of the MLPSA.  As such, BOA was of course free to deviate from its own standards in its origination of the Loan.  However, the fact that these internal guidelines may well be discretionary does not, *a fortiori*, mean that they do not accurately reflect customary

16

industry standards, as described in Rep 39.  In fact, courts have considered internal guidelines as relevant equivalents to industry standards.  *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014, 1031 (S.D. Ohio 2009) ("This Court concludes that evidence that LaSalle did not meet its own internal underwriting guidelines is competent evidence it did not meet customary industry standards for underwriting. Indeed, it comes close to judicial estoppel on this point, which the Court declines to find because it has not been argued by Wells Fargo."); *Lehman Bros.*, 237 F. Supp. 2d at 630 (finding that proof that Lehman did not adhere to its own underwriting guidelines was relevant to industry standards and granting summary judgment in Plaintiff's favor on the issue of whether Lehman breached its warranty that "[t]he origination, servicing and collection practices used by [Lehman] or any prior holder of the Mortgage Note have been in all respects legal, proper and prudent and have met customary industry standards" (alteration in original)).  Therefore, the record evidence that BOA failed to meet its own internal guidelines in originating the Loan is competent evidence that it failed to adhere to industry standards, as required by Rep 39.  Accordingly, BOA breached Rep 39 when it originated the Loan without 15% cash equity, and summary judgment for Wells Fargo is appropriate on the issue of breach.[12]

---

[12] BOA does cite several cases in which courts declined, as a matter of law, to equate internal guidelines with industry standards, but the cases are not directly on point.  *See, e.g.*, *Didzbalis v. Sheridan Transp. Co.*, No. 00 Civ. 4329, 2002 WL 31619071, at *2 (S.D.N.Y. Nov. 19, 2002) (noting that "[g]enerally, expert testimony is necessary for the introduction of custom and practice evidence" as to the customs and practices used in the mooring a particular vessel); *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. Civ. 05-5155, 2010 WL 741971, at *4-5 (E.D.N.Y. Feb. 23, 2010) (discussing the difference between lay and expert testimony, and concluding that the latter is necessary when testimony extends beyond first-hand knowledge and includes custom and practice).  Moreover, BOA correctly points out that courts are loathe to grant summary judgment in the context of dueling expert reports.  *See Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) ("[W]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment." (alteration in original) (quotations omitted)). However, BOA's expert has opined that at least with respect to

### 4.   Repurchase Remedy

In order to invoke the remedy of repurchase, Wells Fargo must show both (1) a breach of

a Rep and (2) that such breach was material.[13]  As noted, the PSA defines a *breach* as "any

breach of representation or warranty made by the Mortgage Loan Seller pursuant to Section 4(b)

of the Mortgage Loan Purchase and Sale Agreement."  (Def.'s Ex. C at BANA_HART_282407.)

In order to be material, however, such a breach must be one that "materially and adversely

affects the interests of the Certificateholders, . . . with respect to the affected Mortgage Loan,

including but not limited to a material and adverse effect on any of the distributions payable

[associated with] any of the Certificates or on the value of such Certificates or such Mortgage

Loan."  (*Id.* at BANA_HART_282442.)  The MLPSA has a similar provision.[14]  Moreover, the

---

underwriting, BOA's guidelines appear to be "by and large" consistent with industry standards
(Pl.'s Ex. 25 at 145), a point with which Wells Fargo's expert agrees.  And BOA, while disputing
that the experts agree, has stated that "Bank of America's Guidelines in effect at the time of the
Loan were not inconsistent with customary industry standards."  (Def.'s SMF at ¶ 42.)

[13] Section 2.03(c) of the PSA states, in pertinent part:

> Promptly upon its becoming aware of any Material Document
> Defect or *Material Breach with respect to any Mortgage Loan*, the
> Master Servicer shall (and the Special Servicer may) notify the
> Mortgage Loan Seller in writing of such Material Document
> Defect or Material Breach, as the case may be, and direct the
> Mortgage Loan Seller that it must, not later than 90 days from the
> receipt by such parties of such notice (such 90-day period, the
> "Initial Resolution Period"), correct or cure such Material
> Document Defect or Material Breach, as the case may be, in all
> material respects, or repurchase the Defective Mortgage Loan (as,
> if and to the extent required by the Mortgage Loan Purchase and
> Sale Agreement), at the applicable Purchase Price.

(Def.'s Ex. C at BANA_HART_282496 – 97 (emphasis added).)

[14] The MLPSA provides in pertinent part:

> Upon discovery of any Material Breach or Material Document
> Defect, the Purchaser or its designee shall notify the Seller thereof
> in writing and request that the Seller correct or cure such Material
> breach or Material Document Defect. Within 90 days of the earlier

PSA establishes a contractual damages amount in the form of the Purchase Price, which it

defines as follows:

> With respect to any Mortgage Loan, a price equal to the unpaid
> principal balance of the Mortgage Loan as of the date of purchase,
> together with (a) all accrued and unpaid interest . . . , (b) all related
> unreimbursed Master Servicing Fees, Special Servicing Fees,
> Trustee Fees . . . and Servicing Advances . . . , (c) all accrued and
> unpaid Advance Interest in respect of related Advances, (d) any
> Additional Trust Fund Expenses in respect of such mortgage Loan
> . . . , (e) Liquidation Fees (if any) payable in connection with a
> purchase of a Mortgage Loan and (f) any cost, fees and expenses
> of enforcement (including attorneys fees) of a repurchase
> obligation pursuant to Section 2.03(h).

(Pl.'s Ex. 8 at BANA_HART_282458.)

BOA contends that Wells Fargo "has failed to demonstrate that its claimed damages were

caused by Bank of America's alleged breaches of the MLPA, as opposed to other factors such as

Carlin's fraud, the precipitous decline in the real estate market or Plaintiff's failure to promptly

market and sell the Loan and/or Property."  (Def.'s Opp. at 15.)  Accordingly, BOA has moved

for summary judgment on all of Wells Fargo's alleged breaches, arguing that any breach is

immaterial as a matter of law, and thus, fails to give rise to the remedy of repurchase that Wells

Fargo advances as appropriate.  Additionally, BOA contends that Wells Fargo's request that the

Court compel repurchase is a "request for specific performance to which Plaintiff is not entitled."

(Def.'s Opp. at 59.)  Specifically, BOA notes that (1) repurchase of the Loan—is impossible in

this case, because the mortgage securing the Loan has been foreclosed and almost all of the

---

> of discovery or receipt of written notice by the Seller that there has
> been a Material Breach or Material Document Defect (such 90-day
> period, the "Initial Resolution Period"), *the Seller shall* (i) cure
> such Material Breach or *(ii) repurchase each affected Mortgage*
> *Loan or REO Loan (each, a "Defective Mortgage Loan") at the*
> *related Purchase Price* in accordance with the terms hereof and, if
> applicable, the terms of the Pooling and Servicing Agreement. . . .

(Pl.'s Ex. 3, MLPSA at § 4(c) (emphasis added).)

Property has been sold; and, alternatively, (2) Wells Fargo has not made the "required showing that money damages would not be an adequate remedy."  (*Id.*)  In response, Wells Fargo argues, *inter alia*, that the repurchase remedy is a liquidated damages provision, and, even if construed as a specific performance remedy, reflects a provision that is "routinely enforced" in CMBS loan cases.  (Pl.'s Mem. at 41.)

### a.    Material Adverse Effect

Material Adverse Effect ("MAE"), as defined in the PSA, refers to a breach that materially and adversely affects the interests of the Certificateholders.  As BOA notes, "material means significant; adverse means harmful; and, *effect means to cause*."  (BOA Rep. at 23 (quoting Def.'s Ex. AAAAAA at 22) (emphasis added).)  The failure of BOA to comply with its own origination procedures resulted in the closing of a loan whose borrower had not provided any cash equity to the Property's purchase price.  The risks of such a decision are evident and manifest; as discussed *supra*, a buyer who is unable to contribute a cash deposit towards the acquisition of the slated asset is one who is more likely to default, as (1) without any personal exposure associated with an otherwise non-recourse CMBS loan, a borrower lacks direct incentive to avoid default, and (2) one unable to front the cash deposit is potentially one who is too illiquid to maintain loan payments over time.  These risks in particular are among those which originally gave rise to origination requirements such as those described in BOA's internal guidelines.[15]  To argue that the lack of cash equity in this deal is insignificant is to ignore the

---

[15] As Wells Fargo's expert notes:

> The requirement of cash equity began with discussions with insurance companies and banks that experienced significant losses in the 1980s.  They would visit the rating agencies to explain the reasons for the losses.  The absence of cash equity in the deals was one of the main reasons for defaults and delinquencies . . . . [The insurance companies and banks that had suffered losses] frequently

essential purpose behind the requirement.  Moreover, such a dearth of capital is necessarily harmful to the interests of the Certificateholders.  In keeping with other courts' approaches, the Court declines to equate MAE with causing the loan to default.  While the terms of the PSA do indeed reflect a causal requirement, the breach need only cause harm, though not necessarily default.  *See Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 335 (S.D.N.Y. 2012) ("Contrary to EMC's argument, the parties' written agreements do not provide that breaches of representations or warranties must cause any HELOC loan to default, before the Note Insurer can enforce its remedies under the repurchase provision.  Had the parties intended this requirement, they could have included such language.  They did not, and the Court will not do so now 'under the guise of interpreting the writing.'" (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (Ct. App. 2001) (citation omitted))).

### b.    Remedy

"When specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless specific performance is granted."  *Wells Fargo*, 2013 WL 372149, at *8 (citing *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999)).  Here, "[t]he Court agrees with Defendant that Plaintiff would not be entitled to the 'extraordinary remedy' of specific performance—because . . . repurchase of the mortgage loans at issue is impossible."  *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, No. Civ. 08-1125-C, 2011 WL 3739170, at *2 (W.D. Okla. Aug. 23, 2011).  This is because "the mortgage securing the Loan has been foreclosed and almost all of the Property has been sold."  (Def.'s Opp. at 59.)

---

commented that borrowers who had no skin in the game defaulted quicker than borrowers who had cash invested in their property. (Pl.'s Ex. 2 at 23-24.)

However, "[t]he CMBS case law and the parties' contract make clear that a 'repurchase provision is designed to shift the risk to the selling party in the event that a dispute arises,' and that such a provision is the appropriate method of making Plaintiff whole once a breach of warranty is established." *Wells Fargo (Okla.)*, 2011 WL 3739170, at *3 (applying New York Law) (quoting *Resolution Trust Corp. v. Key Financial Servs., Inc.*, 280 F.3d 12, 18 (1st Cir. 2002) (same)). Moreover, though not unheard of, *see LaSalle Nat'l Bank Ass'n v. Capco Am. Sec. Corp.*, No. 02 Civ. 9916, 2005 WL 3046292, at *6 (S.D.N.Y. Nov. 5, 2005), the Court need not determine that the instant damages provisions constitute a liquidated damages clause in order to find that Wells Fargo should nevertheless be made whole by application of the purchase price calculation. *See, e.g.*, *Wells Fargo (Okla.)*, 2011 WL 3739170, at *4 ("Because Plaintiff relies on only one case as support for its conclusion, it does not explain why damages would be difficult to calculate or why the contract's language requiring an assessment of reasonableness is for a certain amount, the Court is not persuaded by Plaintiff's argument that the purchase price is a liquidated damages clause. . . . Accordingly, the purchase price provision is not a liquidated damages clause; this conclusion, however, does not disrupt the prior finding that such clause is the appropriate method of calculating damages so as to make Plaintiff whole.").

The parties bargained for the purchase price calculation as defined in the PSA, and BOA's contention that this calculation applies only where repurchase is *possible* is unavailing in light of the case law. *See id.* at *3; *Resolution Trust*, 280 F.3d at 18 ("[Defendant] claims that repurchase is [Plaintiff's] sole remedy under the contract, and therefore, awarding general contract damages provides [Plaintiff] with a windfall. [Defendant's] argument is misplaced. Whether or not [Plaintiff] committed an independent breach by failing to repurchase on demand, the district court was free to make [Defendant] whole, and it did so in terms of the obligation

imposed by the contract." (internal footnote omitted)); *Lehman Bros.*, 237 F. Supp. 2d at 638

(concluding that the purchase price as defined in the PSA was an appropriate damages

calculation where it was not possible for Defendant to repurchase the applicable loan); *Capco*,

2005 WL 3046292, at *5 ("The parties agreed to a method of calculating the repurchase price.

PSA, § 1.01.  By awarding damages in the amount that Capco agreed to pay in the event of

breach, the court will make LaSalle whole.").  Here, repurchase is impossible, given the

foreclosure and subsequent sale of the Property; however, the PSA specifically provides that, in

the event of a material breach of the MLPSA, the purchase price, offset by any proceeds

generated by Plaintiff's liquidation of the Properties that are not provided as reimbursement to

the Trust for reasonable servicing advances, represents the appropriate damages calculation.

Moreover, given the risk allocation behind repurchase provisions such as the one at issue here, a

general mitigation defense, as advanced by BOA, is inapplicable to these circumstances.  *See*

*Wells Fargo (Okla.)*, 2011 WL 3739170, at *6; *cf. Resolution Trust*, 280 F.3d at 18

("[Defendant] and [Plaintiff], two sophisticated parties, negotiated how the risks and costs of this

transaction would be distributed, and resolved the issue by drafting § 3.1.  [Defendant's] cries of

injustice fall on deaf ears, as [Defendant] freely contracted for the obligations by which it now

finds itself bound.").

## C.    The Grant Declaration

BOA also moves to preclude the Declaration of Michael Grant, which was omitted from

discovery and only later attached by Wells Fargo to its motion for summary judgment.  (Def.'s

Mem. Prec. at 2.)  According to BOA, the Grant Declaration "purports to establish that Bank of

America was aware that [an outside company] was managing the Property for a fee," in

contravention of Rep 15.  (*Id.* at 6.)  As the Court has already determined that BOA breached

Rep 39, and did not rely on the Grant Declaration in so doing, this motion is denied as moot.

**III.   Conclusion**

For the foregoing reasons, Wells Fargo's motion for summary judgment is GRANTED;

BOA's motion for summary judgment is DENIED; and BOA's motion to preclude the

Declaration of Michael Grant is DENIED as moot.

The Clerk of the Court is directed to close the docket entries at numbers 73, 77, and 80.


SO ORDERED.


Dated: New York, New York
       March 28, 2013

_____
            J. PAUL OETKEN
         United States District Judge